DAVID J. HERRELL v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—18 S. W. (2d) 481.

Division One, March 29, 1929.

E. T. Miller, A. P. Stewart and C. H. Skinker, Jr., for appellant.

*Foristel, Mudd, Blair & Habenicht* for respondent.

ATWOOD, P. J.—This is an action for damages for personal injuries sustained by respondent as the result of a crossing collision between an automobile, owned by him and driven by his minor son, and appellant's freight train.

The collision occurred at the crossing of an east-and-west public road over defendant's track at the village of Imperial, in Jefferson County, Missouri, about 10:30 o'clock on the morning of January 12, 1924. The automobile involved was a Ford coupe, which was owned by plaintiff and driven by his minor son, Roy Herrell, who was then about nineteen years of age. The train was north-bound and the automobile was being driven eastwardly on the pub-

lic road toward defendant's north-and-south main track. Plaintiff was sitting to the right of the driver, and the train approached from plaintiff's right. The train and the automobile met on the crossing, and the step on the left end of the pilot beam of the locomotive struck the running board on the right side of the automobile just back of the right front wheel. Neither plaintiff nor his son was injured in the collision at the crossing. The automobile, with the two men therein, was carried along by the locomotive until the automobile came in contact with a switch stand located on the left side of the track between seven hundred and eight hundred feet north of the crossing. The automobile was demolished when it struck the switch stand and plaintiff and his son were thrown out and injured. The evidence pertinent to the matters raised on this appeal will be more fully stated in the course of our opinion.

Plaintiff pleaded the humanitarian doctrine and several grounds of primary negligence. Defendant's answer consisted of a general denial, a plea of contributory negligence on the part of plaintiff, and a plea of contributory negligence on the part of plaintiff's minor son Roy Herrell, who was driving the automobile. The reply was a general denial. At the close of plaintiff's case defendant filed a demurrer to the evidence, which was overruled. At the close of the whole case defendant requested a peremptory instruction, and this was denied. The case was submitted on the humanitarian doctrine and on three assignments of primary negligence, to-wit, failure to give statutory signals, failure to give any signal or warning, and excessive speed. The jury returned a verdict for plaintiff on the first count, assessing his damages at the sum of $9500 and defendant has appealed from the judgment rendered thereon.

Appellant contends that no case was made for the jury because, (a) the evidence was insufficient to justify submission of the case on the above specifications of primary negligence, and (b) even if there was sufficient evidence to justify the submission of these specifications of primary negligence yet plaintiff's right of recovery is barred by his own contributory negligence, and (c) that the contributory negligence of plaintiff's son who drove the automobile also bars his recovery; and (d) that the evidence was insufficient to justify the submission of the case to the jury under the humanitarian doctrine. Other errors assigned relate to the giving and refusing of instructions.

Relative to plaintiff's first and second grounds of primary negligence, to-wit, defendant's alleged failure to give statutory signals or any signal, counsel for appellant in their printed argument say:

> "The evidence of the witnesses on behalf of plaintiff as to the sounding of statutory signals by bell and whistle is negative in character, that is, they did not testify positively that no signals were given, but merely that they

did not hear any. The same is true as to primary negligence in giving any warning.'' According to the record defendant's engineer testified that, approaching the Imperial crossing, he sounded a road-crossing whistle consisting of two long and two short blasts at the whistling post located approximately thirteen hundred feet south of the crossing, and repeated this crossing signal about half way between the whistling post and the crossing. Defendant's fireman and head brakeman testified to the same effect, the head brakeman further testifying that he rang the bell by pulling the bell rope. Plaintiff introduced positive evidence to the contrary. Alec Hubert, produced as a witness by plaintiff, testified that he was standing within fifty feet of this whistling post and watched the train from the time it came in sight about a mile south of the whistling post until it passed him, and neither whistle nor bell was sounded. The same witness further testified that he continued to watch the train and ''it did not whistle or ring a bell'' until after it had crossed the public road at Imperial. It is true that plaintiff testified that he heard neither engine whistle nor bell, and several other witnesses produced by him testified that they did not hear the sound of either an engine whistle or bell, although they were in position to hear if any had been sounded; but the record does not support counsel's assertion that the evidence of plaintiff's witnesses as to the sounding of the bell and whistle ''is negative in character.'' Some of it is quite positive, and counsel for appellant virtually concede this in the emphasis they lay upon the following quotation from Sanguinette v. Railway, 196 Mo. l. c. 488, 489 (italics theirs):

''Notwithstanding these facts, plaintiff's husband neither stopped. looked nor listened for an approaching train, but in utter disregard of his safety, drove heedlessly onto the railroad track, and as a consequence of such heedlessness and carelessness was struck and killed by defendant's train, *without any proved negligence upon the part of those in charge of such train, for the evidence was altogether conflicting with respect to the alleged failure of defendant's servants to sound the whistle or ring the bell as the train approached said crossing.*'' A careful reading of the entire opinion in the Sanguinette case satisfies us that in using the above language it was not the court's intention to hold, as counsel apparently infer, that mere conflict between the evidence of plaintiff and that of defendant as to alleged failure of defendant's servants to sound the whistle or ring the bell renders plaintiff's evidence insufficient to go to the jury. The determination of such conflicting evidence is peculiarly within the province of the jury, and plaintiff's evidence was sufficient to go to the jury on plaintiff's first and second assignments of primary negligence.

The above ruling incidentally disposes of appellant's complaint made with reference to its second assignment of error that the giving of plaintiff's instruction number one "is not supported by the evidence since there was no proved negligence on the part of defendant in failing to give the statutory signals." It also answers appellant's contention appearing in its third assignment of error that the court erred in refusing to give defendant's requested instructions numbered 3 and 4 which purported to withdraw from the jury the respective issues of negligence on the part of defendant in failure to give the statutory signal and failure to give any signal or warning as required by the common law. There being evidence sufficient to go to the jury on these assignments of negligence the instructions were properly refused.

Plaintiff's third specification of primary negligence, excessive speed of the train, was submitted in the following part of his given instruction numbered 3:

"If you further find and believe from the evidence that at and immediately prior to the time of said collision, if you find there was such collision, the defendant, through its agents and servants in charge of said train, ran and operated its said locomotive and train of cars at a rate of speed that was high, excessive, dangerous and unreasonable, under the circumstances in evidence in this case, and so as to endanger the life and limbs of persons there, and property there, and particularly the plaintiff and his automobile, and that as a direct result thereof the said collision occurred," etc. Counsel for appellant contend that there was not sufficient evidence to go to the jury on this specification of negligence, citing McGee v. Railroad, 214 Mo. 530, 541, and Burge v. Railroad, 244 Mo. 76, 103, where we held that "in the country, between stations, away from congested populations, it is not negligence for passenger trains to run at a rapid speed over road-crossings." The early case of Maher v. Railroad, 64 Mo. 267, 275, might also be cited wherein this court said: "No conceivable rate of speed is *per se* negligence, except where the law of the State or a municipal corporation, authorized to do so, prescribes a limit." It is obvious, however, that such a rule is somewhat abstract and must yield where relevant circumstances other than the rate of speed appear, and in later opinions we have held that the rate of speed at which cars or trains travel may or may not be negligent according to the circumstances of the particular case. [Beier v. St. Louis Transit Co., 197 Mo. 215; Harrington v. Dunham, 273 Mo. 414, 430.] In Montague v. Mo. & K. I. Ry. Co., 305 Mo. 269, 280, speaking through GRAVES, J., we said: "Negligent speed at common law is dependent upon all the surrounding circumstances." Also, in 22 Ruling Case Law, page 1011, it is said: "As a general rule it is for the jury to say,

under proper instructions from the court, whether or not the speed of the defendant's train was such as to amount to negligence under all the circumstances and conditions surrounding the alleged accident or injury." In treating of speed in connection with precautions the same text (p. 1012) reads: "Likewise where warning signals are given but the speed of the train is such as to render them useless, such speed is negligent. This is particularly true when their sound is obstructed by winds and other noises, and when intervening objects prevent those who are approaching the railroad from seeing a coming train." Also, (p. 1013): "Where a railroad crossing is dangerous, the company does not perform its whole duty to travelers in the highway by sounding the whistle and bell at a proper distance as the train approaches such crossing. It owes the additional duty to such travelers to pass such crossing at a reasonable rate of speed, proportioned to the danger, and is guilty of negligence in crossing at a high rate of speed."

The opinions in the McGee and Burge cases indicate that the trains there considered were passenger trains and the crossings were ordinary crossings "in the country, between stations, away from congested populations." Looking to the circumstances of the instant case we find that this was a freight train and the crossing was not in the country, but at the town of Imperial, which was apparently not incorporated but contained one hundred and fifty to two hundred inhabitants. Furthermore, it was not between stations, but right at defendant's station at Imperial, on a gravelled public road or street much travelled by persons in vehicles and on foot which extended along the south side of the station, connected it with the main part of the village west of defendant's main track, and ran thence east about three-fourths of a mile to the town of Kimmswick. Defendant's approach to this crossing from the south was about one per cent down grade on a curve around a high hill which interfered with sight and sound until the engine was within about two hundred seventy-five feet of the crossing. The evidence showed that after striking the car the engine ran nearly one thousand feet north of the crossing before the train was stopped. Moreover, Mr. Woods, defendant's engineer in charge of the train, called as a witness for defendant testified that this was a hazardous crossing. Such were the circumstances appearing in this case, and they made the assignment of excessive speed as a ground of negligence a proper question for the jury. [Ward v. Mo. Pac. Railroad Co., 311 Mo. 92; Toeneboehn v. St. Louis-San Francisco Railroad Co., 298 S. W. (Mo. Sup.) 795, 801; Heinzle v. Railway, 182 Mo. 528, 555.] It follows from this conclusion that the trial court did not err in submitting in the alternative in instruction numbered 3 the specifica-

tions of negligence that the speed of the train was excessive and that defendant's agents failed to sound any signal or warning.

Appellant also complains of the trial court's refusal of defendant's requested Instruction 12 which reads as follows:

"The court instructs the jury that no rate of speed of the train in question was negligent, no matter how fast the same may have been." In the light of the evidence this instruction was properly refused. [Klockenbrink v. St. L. & M. R. Ry. Co., 172 Mo. 678, 690.] Appellant also assigns error in the refusal of defendant's requested Instruction 2 withdrawing plaintiff's specification of excessive speed from the jury. Since there was sufficient evidence to go to the jury on this specification of negligence, the instruction was properly refused.

Turning now to appellant's contention that the evidence was insufficient to take the case to the jury under the humanitarian rule, and bearing in mind that the question of negligence submitted on this theory of the case was not failure to stop the train but failure to warn, we look further into the facts. The highway in question appeared to be the principal way of vehicular travel through the village of Imperial. Defendant's track approached and left its intersection in the form of an arc. The south arm of this arc curved around a high hill which obstructed the view of an approaching train for a distance of 250 to 300 feet south of the crossing and also tended to deflect the sound of its approach. A building referred to as the school hall, situated about fifty feet west of the crossing and about the same distance south of the highway, presented a further obstruction to the view. Defendant's engineer testified that it was a hazardous crossing. Charged with knowledge of frequent vehicular travel at that point and of their obscured approach, it was the duty of defendant's agents, servants and employees when approaching this crossing to keep a sharp lookout for travellers on the highway and give timely warning if possible to prevent injury. Did they see or in the exercise of ordinary care could they have seen plaintiff in a place of peril and oblivious of danger in time to have warned him and so avoided the collision?

As the engine rounded the curve about 300 feet south of the crossing, the fireman, whose special duty it was to keep a lookout, was busy coaling the engine. The engineer was seated on the right side of the cab and says that he knew nothing of any danger of a collision until he was practically upon the crossing when brakeman Ozee gave him a stop signal. The whole duty of looking out for this crossing was therefore left to Ozee, the head brakeman, who was seated at the window on the left side of the cab. He testified that the complete crossing whistle was sounded twice and that on those occasions

he was ringing the bell on the engine by means of a hand cord, the automatic device being out of order. He also testified that he saw plaintiff's car as soon as it came out from behind the school hall; that when he was within one hundred and eighty-eight feet of the crossing he could see past the corner of the building and up the road a piece; that when he first saw the automobile the front end of the train was about one hundred feet south of the crossing; that the train was then going from twenty to twenty-five miles an hour, and the automobile from ten to fifteen miles an hour; that when he first saw the automobile it was about fifty feet west of the crossing; that its speed was not reduced, and "when it was about fifteen or twenty feet, or probably closer to the track," he called to the engineer to stop and gave him a stop signal. According to Ozee's own testimony he saw or by the exercise of ordinary care could have seen plaintiff's car coming east with no diminution of speed when it was more than fifty feet west of the crossing. He said he knew that the machine was going to be hit if something was not done by one party or the other, and that it would have taken him "probably a second" to give a signal. Assuming that it was then too late to cause the engineer to stop the train or sound the whistle in time to have prevented a collision, Ozee still had time to ring the bell and thereby warn the occupants of the car who were driving into the danger zone and evidently oblivious of peril. Under the last-chance doctrine it was plainly his duty to do so. Did he do it? He testified that he rang the bell when the crossing signals were given some distance farther down the track, and there was some testimony from which it may be inferred that he continued to do so, but there was also positive testimony in plaintiff's behalf that neither the whistle nor the bell was sounded. Under the circumstances indicated merely giving the statutory signals would not relieve defendant of its common-law duty to warn if such warning could have been given in time to have prevented the collision. [Allen v. C. B. & Q. Railroad Co., 313 Mo. 42, 62.] The duty and opportunity to give such timely warning by ringing the bell were apparent, and it was for the jury to say whether or not such warning was given. The evidence was sufficient to justify submission of the case under the humanitarian rule. [Maginnis v. Railroad, 268 Mo. 667, 678; Chapman v. Mo. Pac. Ry. Co., 269 S. W. (Mo. Sup.) 688, 690; Logan v. Railroad, 300 Mo. 611, 634; Chawkley v. Wabash Railroad Co., 297 S. W. (Mo. Sup.) 20, 23; Allen v. Railroad, 313 Mo. 42, 61.]

Appellant insists that we should rule otherwise on the strength of our holding in State ex rel. Railroad v. Bland, 313 Mo. 246, 254. That case reached us on writ of certiorari directed to the Kansas City Court of Appeals. We held that the driver of the automobile being approximately fifty feet from the track and moving toward it

at the rate of ten miles an hour apparently oblivious of the on-coming train, and the train being one hundred feet away approaching at the rate of twenty miles an hour, the driver's peril was obvious. In this respect the two cases are similar and the same ruling applies. However, in the Bland case the Court of Appeals further ruled in effect that the fireman was negligent in telling the engineer to stop the train instead of telling him to sound the whistle, and we held that this ruling was in conflict with certain of our prior controlling decisions because under the facts shown the nicety of calculation necessary to reach this conclusion made it conjectural. Under the pleadings, evidence and instructions given in the instant case no such nicety of calculation appears in connection with the question of warning by ringing the bell, and hence, what we said in the Bland case does not aid appellant's contention.

Holding that the evidence was sufficient to take the case to the jury under the humanitarian rule it follows that instruction numbered 2 submitting the same was properly given, and that defendant's requested Instruction 7 seeking to withdraw this issue from the jury was properly refused.

Counsel for appellant also say that even if there was sufficient evidence to justify the submission of plaintiff's specifications of primary negligence yet plaintiff's right to recover is barred by his own contributory negligence and that of his son in failing to look and listen in time to have discovered the train and avoided the collision. As against these specifications such contributory negligence would be a good defense, but not as against defendant's negligence under the humanitarian rule. Having found that the evidence was sufficient to take that as well as plaintiff's other specifications to the jury we are now concerned only with the submission of that defense. If the alleged failure to look and listen was the sole cause of the collision it was a good defense to every specification of negligence and it was so submitted in defendant's given instruction number 6. Defendant's requested instructions numbered 9, 10 and 11 further presenting the defense of contributory negligence ignored the humanitarian rule and were, therefore, properly denied. Appellant also finds fault with plaintiff's given Instruction 5, commenting thereon as follows: "Where to look was to see the approaching train, neither plaintiff nor the driver of the automobile had the right to rely exclusively on the presumption that defendant would observe reasonable care in the operation of the train." Instruction number 5 clearly states the alleged defense and proceeds as follows:

"As to these defenses, the court instructs you that under the law the said Roy Herrell, if you find that he was driving upon a public highway and approaching the railroad track in question, and that

under the circumstances in evidence there were obstructions to view, and the plaintiff, if you find he was riding in said automobile, and that they each exercised the highest degree of care to see or hear the approaching train, and that they, or either of them, could not, in the exercise of such care, either see or hear any indication of the said approaching of said train before going into a position of danger, then neither Roy Herrell nor the plaintiff can be charged with negligence in assuming that there was no train sufficiently near to make the crossing dangerous, and that they had a right to assume that in handling their train the defendant company would act with a degree of care set out in these instructions, in that they would give the usual signal of the approach of said train, if you find such signals were ordinarily given, and that they would be seasonably given, and that the servants in charge of said train would be, in the exercise of ordinary care, attentive and vigilant so to do.''

Plaintiff testified that when the car passed the east line of the school building he looked south and saw no train, that he then looked north and before he could look south again the engine struck his car. North of the crossing the main track curved west and some buildings on the west side of the track obscured the view. The presence of these obstructions may account for his apparently longer look to the north. He said that the car was going about eight miles an hour as it passed the school hall and about five or six miles an hour when the car got within twenty feet of the west rail, that he had lived in that vicinity most of his life, was familiar with the crossing, and that it was usual and customary for a whistle to be blown or a bell rung whenever a train approached that crossing. The train in question was moving on no special schedule but usually reached Imperial within the hour. Under the circumstances in evidence and covered by this instruction it does not necessarily follow that to look southward as plaintiff did was to see the approaching train, or that he may not recover because he did not again look south in time to discover the train and avoid the collision. Nor did the instruction tell the jury that the driver of the automobile had a right to rely exclusively upon the presumption that defendant would observe reasonable care. The jury was required to find that plaintiff and his son ''each exercised the highest degree of care to see or hear the approaching train.'' Not until they had so found could they further find that neither plaintiff nor his son could be charged with negligence ''in assuming that there was no train sufficiently near to make the crossing dangerous,'' and that ''they had a right to assume that in handling their train the defendant company would act with a degree of care set out in these instructions, in that they would give the usual signal of the approach of said train,'' etc. The propriety of such an instruction on the evidence in

this case appears from our views expressed in Kennayde v. Railroad, 45 Mo. 255; Weigman v. Railroad, 223 Mo. 699, 719; and State ex rel. v. Trimble, 254 S. W. (Mo. Sup.) 846, 850.

No reversible error appearing in the record here presented the judgment is affirmed. All concur, except *Frank, J.,* not sitting.